# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

| | | | |
|---|---|---|---|
| **UNITED STATES OF AMERICA** | **)** | | |
| | **)** | | |
| **v.** | **)** | **No.** | **2:06 CR 118** |
| | **)** | **No.** | **2:10 CV 365** |
| **JEWELL G. HARRIS, SR.** | **)** | | |

## OPINION and ORDER

Defendant Jewell G. Harris, Sr. ("Harris") was convicted by a jury of two counts of mail fraud in violation of 18 U.S.C. § 1341, two counts of wire fraud in violation of 18 U.S.C. § 1343, and two counts of money laundering in violation of 18 U.S.C. § 1957. (DE # 93.) He has filed a motion to vacate his sentence and conviction pursuant to 28 U.S.C. § 2255. (DE # 200.) A motion under Section 2255 allows a federal prisoner "in custody . . . claiming a right to be released" to attack his sentence on the grounds that it was imposed "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction . . ., or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255 ¶ 1. Relief under Section 2255 is "reserved for extraordinary situations." *Prewitt v. United States,* 83 F.3d 812, 816 (7th Cir. 1996). Relief should be granted when the defendant shows that there was an "an error of law that [was] jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice. " *Bischel v. United States,* 32 F.3d 259, 263 (7th Cir. 1994).

**EVIDENCE PRESENTED AT TRIAL**

Harris owned several businesses including Enterprise Trucking & Waste Hauling ("Enterprise"). (John Urbanik, Trial Tr., vol. 2, 27.) Enterprise had several contracts with the City of Gary ("the City"). Pursuant to one of these contracts, Enterprise removed concrete and debris ("C & D") from buildings being demolished as part of the City's redevelopment project. (Vincent Allen, Trial Tr., vol. 1, 106; Gov.'s Trial Exh. 43.) This contract commenced June 14, 2000 and terminated on June 14, 2001. (*Id.* at 2.) Under this contract, Enterprise was paid $25.50 per ton for disposing of the City's demolition activity debris including C & D, bricks, and dirt. (*Id.* 1-2.) The City and Enterprise signed a modification to the June 14, 2000 demolition debris disposal contract on October 24, 2001. (Gov.'s Trial Exh. 44.) This contract was retroactive as of June 14, 2001, and terminated on December 31, 2001. (*Id.*) Enterprise also had an August 5, 1998 contract for hauling and supplying back-fill materials to the City's in-house (meaning the City demolished the houses itself) demolition sites. (Gov.'s Trial Exh. 42; Geraldine Tousant, Trial Tr., vol. 2, 99-100.) Under this contract, the city agreed to pay Enterprise $3.50 per ton for hauling. (Gov.'s Trial Exh. 42. at 3.)

In the summer of 2001, the City of Gary was preparing to build a new baseball stadium. (Gov.'s Trial Exh. 6; Urbanik, Trial Tr., vol. 2, 30.) It contracted with Rieth-Riley Construction Company, Inc. ("Rieth-Riley") to have the latter do the mass excavation work to prepare the stadium site for construction because the site needed to be lowered before construction could begin. (William Douglas Robinson,

Trial Tr., vol. 1, 55.) The contract, worth almost $3.5 million, included disposal of the excavation material. (*Id.* at 53, 60; Gov.'s Trial Exh. 5.) The City's specifications for the work were incorporated into the City's contract with Rieth-Riley and stated that materials to be cleared from the site, including those removed from both above and below grade, would become the property of the contractor and should be removed from the site. (Gov.'s Trial Exh. 6, 02230-1; Urbanik, Trial Tr., vol. 2, 50.) Under the contract, Rieth-Riley was responsible for removing and disposing of all of the materials excavated from the site. (*Id.* at 51; Robinson, Trial Tr., vol. 1, 60.) The material to be disposed included sand that Rieth-Riley would then deliver to another of its job sites on a bridge of U.S. Route 41 ("Route 41 site"). (*Id.* at 62.)

Enterprise had a contract with Rieth-Riley to haul excavated material from the stadium site and Rieth-Riley paid Enterprise $60-$80 an hour for that work. (Gov.'s Trial Exh. 7; Robinson, Trial Tr., vol. 1, 65-67.) Rieth-Riley had Enterprise workers fill out time-sheets for the day that served as invoices to Rieth-Riley from Enterprise. (*Id.* at 67.) Enterprise did not submit weigh tickets to Rieth-Riley. (*Id.* at 72.) Rieth-Riley had its own scale and its regional vice president, William Douglas Robinson ("Robinson"), testified that there was never a need for Rieth-Riley trucks, including contracted trucks, to go over the City of Gary's scale. (*Id.* at 72-73.) During cross-examination by Harris's trial counsel, Kevin Milner ("Milner"), Robinson testified that Rieth-Riley contracted with Enterprise to do other work before and after the stadium work and that they may have been working together on other projects while their

stadium contract was underway. (Robinson, Trial Tr., vol. 1, 82-83.) He also testified that Rieth-Riley's billing process had caused confusion for other parties besides Enterprise. (*Id.* at 88-89.)

Vincent Allen ("Allen"), a dispatcher and truck supervisor for Enterprise during the time of the alleged fraud, testified that after Enterprise trucks left the stadium with excavated materials, they would stop at the Gary Sanitary District scale to get weighed. (Allen, Trial Tr., vol. 1, 118.) He testified that, at Harris's instruction, he told the truck drivers to get the material weighed at the Gary scale. (*Id.*) He testified that there was no doubt in his mind that Harris knew that these trucks were being weighed at the Gary scale and that the weigh tickets were important to Harris. (*Id.* at 125.) Defendant's daughter, Marquita Harris, operated the Gary scale to weigh Enterprise trucks. (Marquita Harris , Trial Tr., vol. 1, 189.) There was also evidence that defendant was at the job site and had conversations with Rieth-Riley employees about where the Enterprise trucks should take the excavation material. (Robinson, Trial Tr., vol. 1, 90.)

Allen also testified that there was concrete debris that was buried under the ground. (Trial Tr., vol. 1, 118.) Enterprise's billing time sheets submitted to Rieth-Riley reflected that it billed Rieth-Riley for hauling materials including concrete, sand, dirt, and slag. (Gov.'s Exhs. 13, 14, 15, 18, 20, 24.)

Former Enterprise driver Michael Anthony Campbell ("Campbell") testified that he completed Rieth-Riley time sheets and signed City of Gary weight tickets that were for the same loads being hauled from the stadium excavation site. (Campbell, Trial Tr.,

vol. 1, 160-65.)) Similarly driver Rene Ortiz ("Ortiz") testified that he did hauling for Enterprise under the Rieth-Riley contract, and he would have each load weighed. (Ortiz, Trial Tr., vol. 1, 182.) He testified that each load would be weighed at the City's scale regardless of what was in the load or where it was ultimately headed. (*Id.* at 182.)

The government presented testimony through John Urbanik ("Urbanik"), a retired IRS agent and current investigator for the government, about Enterprise's invoices to Rieth-Riley and the City of Gary. (Urbanik, Trial Tr., vol. 2, 27.) Enterprise billed Rieth-Riley for excavation work from June 30, 2001 to August 9, 2001. (*Id.* at 42.) Rieth-Riley paid Enterprise $91,000 for that work. (*Id.*) Urbanik testified that Enterprise billed the City of Gary for $1.53 million for the same work over the same time period, in other words, the work was double-billed. (*Id.* at 42-43.) The government had invoices from the City of Gary for eleven days of that time totaling over $439,000 and Rieth-Riley was billed $53,900 for the same time. (*Id.* at 43-44.) For the invoices without weigh tickets, Urbanik compared the invoices to the City to the Rieth-Riley time sheets to determine that they involved the same work. (*Id.* at 36.)

Husein Mahmoud ("Mahmoud") was the controller for the City of Gary when the stadium contract was underway. (Mahmoud, Trial Tr., vol. 2, 64.) He testified that Enterprise submitted almost $1.6 million of hauling and disposal invoices related to the baseball stadium and there was no contract for that work when the invoices were submitted. (*Id.* at 72-73.) The City was only able to pay invoices that were made pursuant to a contract. (*Id.* at 67, 69-70.) Therefore, the City entered into a $1.6 million

retroactive contract with Harris, on behalf of Enterprise, so that the invoices could be paid. (*Id*. at 69.) The contract stated that it was for "all work required for the demolition and complete site preparation and clearance and supplemental work as required to meet specifications" set forth in an Exhibit A. (Gov.'s Trial Exh. 39.) Mahmoud testified that he had never seen an Exhibit A and that he understood that it never existed. (Mahmoud, Trial Tr., vol. 2, 72.) The contract was signed on September 19, 2001 by Harris and Suzette Raggs, President of the City's Redevelopment Commission. (Gov.'s Trial Exh. 39.) The Redevelopment Commission ratified the contract on September 19, 2001. (Gov.'s Trial Exh. 37 at 25.) The minutes for the meeting stated that the contract was for "emergency hauling and disposal of demolition material in the Baseball Stadium Project Area." (Gov.'s Trial Exh. 38 at 8.)

Mahmoud testified that he had insisted that a contract be in place before Enterprise's $1.6 million in invoices for hauling and disposal at the stadium site could be paid. He testified that at that time he did not know that Enterprise had a subcontract with Rieth-Riley for the stadium excavation. (Mahmoud, Trial Tr., vol. 2, 77.) If he had known that Enterprise had already been paid by Rieth-Riley for the loads hauled from the stadium, he would not have requested a retroactive contract or made the payments to Enterprise. (*Id*. at 78-79.)

The then-Mayor of the City of Gary, Scott King ("King"), testified that there was a dispute about Enterprise's work on the stadium. (King, Trial Tr., vol. 2, 135.) Mahmoud believed that Enterprise's work was not covered by any of its existing

contracts with the City and Harris believed that the work was covered under an existing contract. (*Id.* at 135-36.) King testified that Harris did not say that any the invoices for hauling and disposal at the stadium site were a mistake. (*Id.* at 137-38.) Like Mahmoud, King testified that when he authorized the retroactive September 21, 2001 contract for Enterprise, he did not know that Enterprise had a subcontract with Rieth-Riley for the stadium excavation. (*Id.* at 138.) King was surprised that Harris had not mentioned the subcontract to him because Harris often discussed his business endeavors and opportunities with King. (*Id.* at 139.)

Harris called one witness in his defense, Linda Arce ("Arce"), the office manager for Enterprise. (Linda Arce, Trial Tr., vol. 2, 179.) She stated that Enterprise was extremely busy during the summer of 2001. (*Id.*) She testified that Kelly Vasquez ("Vasquez"), a former IRS agent, was hired into a new position of bookkeeper to help improve Enterprise's bookkeeping practices. (*Id.* at 181-82.) Arce testified that the double-billing happened by mistake because of the amount of work and various contracts that Enterprise had in the summer of 2001. (*Id.* at 200.)

In closing, Harris's attorney, Milner, argued that Enterprise always had a contract with the City for disposal of debris. (Trial Tr., vol. 3, 28.) He argued that Enterprise had a contract with Rieth-Riley just for hauling and then it had a contract with the City for disposal. (*Id.*) He contended that Enterprise's only mistake was in charging both entities for the hauling. (*Id.*) He argued that Enterprise had several different contracts with both the City and Rieth-Riley and that Rieth-Riley had a

confusing billing process. (*Id*. at 30, 34.) He argued that while the retroactive contract said that it was for demolition disposal work, it was really intended to cover any debris disposal related to the stadium. (*Id*. at 28, 37.)

## ANALYSIS

### I.     Ineffective Assistance of Counsel.

Much of Harris's motion is based on argument that he received ineffective assistance of counsel at each stage of his case: trial, sentencing, and appeal. "[A]n ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal." *Massaro v. United States*, 538 U.S. 500, 504 (2003). The test to determine whether an attorney has delivered ineffective assistance such that a defendant's Sixth Amendment right to counsel has been violated is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). The *Strickland* test has two prongs. First, the "defendant must show that the performance of counsel fell outside the 'range of competence demanded of attorneys in criminal cases'–i.e., that it 'fell below an objective standard of reasonableness.'" *Barrow v. Uchtman*, 398 F.3d 597, 603 (7th Cir. 2005) (quoting *Strickland*, 466 U.S. at 687). There is a strong presumption of competence. *Id*.

Second, the defendant must show that he suffered prejudice as a result of his counsel's ineffectiveness. *Id*. In other words, the defendant must demonstrate "a reasonable probability that, *but for* counsel's unprofessional error, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The court should deny an ineffective assistance of counsel claim if the defendant has made an insufficient showing on either prong. *Strickland*, 466 U.S. at 697. The court may assess the prongs in whichever order it chooses. *Id*. Additionally, though Harris has made multiple allegations in support of his claims that trial and appellate counsel were constitutionally ineffective, it must be kept in mind that:

> [I]neffective assistance of counsel is a single ground for relief no matter how many failings the lawyer may have displayed. Counsel's work must be assessed as a whole; it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief.

*Peoples v. United States,* 403 F.3d 844, 848 (7th Cir. 2005) (citing *Bell v. Cone,* 535 U.S. 685, 697 (2002); *Strickland*, 466 U.S. at 690; *Holman v. Gilmore,* 126 F.3d 876, 881-84 (7th Cir. 1997)). Thus, while the court addresses each of the issues which Harris has labeled as grounds individually, it is counsel's performance as a whole that must be judged.[1]

    A.    *Failure to Present Exculpatory Witnesses and Documents.*

Harris argues that his trial counsel, Milner, should have presented evidence that would show that Enterprise was permitted to bill the city for disposal of non-reusable materials ( such as C&D); that the City, via Tousant, knew that he had a subcontract for hauling with Rieth-Riley and granted Enterprise a retroactive contract for disposal in

---

[1] Harris has stated as his eleventh issue for his ineffective assistance of counsel claim that "[t]he cumulative effect of counsel's errors, taken together, prejudiced defendant-movant and affected the outcome of the proceeding." (DE # 200 at 8.) This is the method of analysis employed by the court herein, and so this issue need not be discussed further.

light of this knowledge; that Enterprise hauled demolition material from the stadium blueprint; and that Enterprise had several contracts with both the City and Rieth-Riley while the stadium excavation was under way. As discussed below, much of Harris's argument appears to rest on a contention that was rejected by the jury at trial - that Enterprise's retroactive contract with the City covered not only demolition material, but also excavation material. Harris pushes aside the evidence that showed that Enterprise billed Rieth-Riley and the City for the same work by arguing that the Rieth-Riley contract and invoices were just for hauling, so disposal was not double-billed. Milner made this argument at trial, and as discussed below, the evidence that Harris says Milner should have presented at trial would not have bolstered this argument so as to undermine confidence in the outcome of the trial.

        1.     <u>Testimony of Kenneth Clay and James Meyer and the Letter From Clay to Tousant.</u>

Harris argues that Milner should have presented testimony from two witnesses, Kenneth Clay ("Clay") and James Meyer ("Meyer), and a letter from Clay to Tousant to show that Tousant had knowledge of Enterprise's work on the stadium for Rieth-Riley. (DE # 200 at 3-5.) In his letter, Clay stated that a Rieth-Riley project manager, Mark Turner, told him that Enterprise was working for Rieth-Riley almost every day from June 28, 2001 to July 19, 2001. (Def.'s Exh. G, DE # 200-8.) He stated that Enterprise "removed topsoil and other material for Rieth-Riley." (*Id.*) He added that Enterprise was observed hauling debris for the City of Gary. (*Id.*)

Harris argues that because of this letter, the City had notice that Enterprise had a subcontract with Rieth-Riley. (DE # 200 at 4.) The government responds that Tousant's knowledge was irrelevant to the issue of whether Harris was receiving payments from Rieth-Riley and the City for the same work. (DE # 220 at 13-15.) In reply, Harris argues that Clay's letter shows that Tousant knew that Rieth-Riley was paying Enterprise to haul debris. Therefore, the City made a knowing decision to pay Enterprise to dispose of that same debris. (DE # 223 at 11.)

Harris's argument has not establish a likelihood that he was prejudiced by the omission of this evidence. First, Clay's letter does not show that Tousant was told that Enterprise had a subcontract with Rieth-Riley for hauling debris in the stadium. It just says that Enterprise removed topsoil and other material for Rieth-Riley. This did not provide Tousant with knowledge of the extent or true nature of Enterprise's contract with Rieth-Riley. Second, the letter does not show that Harris was forthright with Tousant or anyone from the City about the subcontract with Rieth-Riley. The information conveyed by Clay in this letter was obtained through an employee of Rieth-Riley. Third, the government presented evidence from which the jury could find that Enterprise billed both the City and Rieth-Riley for the excavation disposal and hauling work. Evidence that Tousant knew of the contract with Rieth-Riley does not show that City expected to be billed twice for the same work.

It was reasonable for Milner not to call Meyer to testify because Meyer's statements on Tousant's knowledge were unclear and potentially negative for Harris.

Meyer told the FBI that he remembered Tousant asking him if the City could pay Enterprise directly for its subcontract hauling for Rieth-Riley or if the City would have to pay Rieth-Riley and then have Rieth-Riley pay Enterprise. (DE # 200-6 at 2.) The timing of this call is not given. It could have been placed after the work was done and billed to both entities. Indeed Meyer stated that he was not aware of Enterprise's stadium-related demolition work until after it was performed and the retroactive contract with the City was created. (*Id*. at 2-3.) Also, Enterprise billed both the City and Rieth-Riley for its hauling work, so it is unlikely that this testimony would have helped Harris.

Further, in his statement to the FBI, Meyer said several things that reflected poorly on Harris. For example, he stated that the retroactive contract between Enterprise and the City was clearly "bullshit." (DE # 200-6 at 3.) He also stated that Harris would use his influence in the City to hold up payments to contractors he did not like. (*Id.* at 4.) Even if this latter statement was unlikely to have been admitted at trial, it still shows that it may have been risky to call Meyer to testify. Therefore, Milner's failure to call Meyer or Clay to testify or to move to admit Clay's letter into evidence does not support a finding that Harris received ineffective assistance of counsel.

<u>2.</u>     <u>Documents Related to Rieth-Riley and City of Gary Projects.</u>

Harris argues that Milner provided ineffective assistance of counsel when he failed to present the following evidence at trial: 1) trip sheets and weigh tickets showing

that Enterprise transported and weighed excavated sand at Rieth-Riley's request;
2) invoices showing that the City was charged for disposal when City trucks brought
debris to the Enterprise dump site and invoices showing that Enterprise brought
backfill to non-baseball stadium sites; 3) invoices from Aavatar Enterprises and
Congress Enterprises to the City for demolition, but not for hauling or disposing of
debris; 4) invoices showing that Enterprise hauled debris for other Rieth-Riley projects,
including the Black Oak site, during the same time that it hauled for the stadium
project; 5) invoices from Fertile Earth, Lake County Transfer Station, and Gary Transfer
Station showing that at the City's request Enterprise hauled debris and other waste for
disposal at other sites besides Enterprise's dump. (DE # 200 at 5.) None of these items
constituted exculpatory evidence that undermines confidence in the result of the trial
and it was not objectively unreasonable for Milner not to present them at trial.

### i. *Weigh Tickets and Trip Sheets to Rieth-Riley for Sand.*

Harris argues that over 300 pages of weigh tickets and trip sheets from
Enterprise to Rieth-Riley for sand (Pet.'s Exh. H, DE # 200-9 - 200-22) would have
shown that Enterprise separated sand from debris and did not double-bill for all loads
of excavation material because it did not double-bill for sand. (DE # 200 at 4.) He
extrapolates that this would have shown that double-billing was an accidental result of
confused bookkeeping practices. Harris has devoted little attention to how these
documents accomplish these feats or how they should have been presented to a jury.
Harris has the burden of proof and persuasion to prove his ineffective assistance of

counsel claim. *United States v. Davenport*, 986 F.2d 1047, 1049 (7th Cir. 1993). Accordingly, it is incumbent upon him to argue how these documents would have assisted him at trial. Instead, Harris largely has just thrown these documents at the court without explaining how they achieve the feats that he attributes to them. Still, the court has sifted through the numerous documents in order to evaluate Harris's claims.

Contrary to Harris's assertions, the weigh tickets to Rieth-Riley for the sand do not necessarily show that these loads were not billed to the City for either hauling or disposal. In fact, there was evidence at trial that each load was weighed on the City's scale, even loads with sand that were taken to the Route 41 site. (Ortiz, Trial Tr., vol. 1, 181-82.) Several of the trip tickets that Harris says should have been entered into evidence were in fact part of the government's evidence at trial. For example, trip ticket 19323 (DE # 200-9 at 15) was part of Government's Exhibit 16, trip ticket 19288 (DE # 200-17 at 26) was part of Government's Exhibit 15, and trip ticket 19338 (DE # 200-17 at 20) was part of Government's Exhibit 17. These trip tickets were included in the invoices to Rieth-Riley that Urbanik matched to the invoices to the City. So these documents were in evidence and were presented to show that loads were billed to both Rieth-Riley and the City. In fact many of the trip tickets in Harris's exhibits to his Section 2255 motion have hand written notes that identify which part of the government's exhibits they were in. However, Harris does not address this issue in his brief or explain why it is certain that these trip tickets were not billed to the City.

Further, even sand trip tickets not included in the government's evidence and Rieth-Riley weigh tickets for that sand do not constitute exculpatory evidence. While the tickets show that some loads were weighed on Rieth-Riley's scales, they do not show that Enterprise was not double-billing for other loads. Given the bulk of these documents, they would have been confusing and cumbersome to present at trial. It was reasonable for Milner to omit these documents in order to streamline the defense at trial. Further, there was other evidence presented about the separation of sand for the Route 41 site and the possible weighing of that sand on Rieth-Riley's scales. Also, this evidence could have weighed the other way - it could have shown that Enterprise was organized and able to separate the responsibilities it had under different contracts but then exploited the contracts with regard to materials that were not valuable and not as closely monitored as the sand. Also, the evidence showed that Enterprise billed both the City and Rieth-Riley for hauling the same loads. This showing is not refuted by evidence that Enterprise did not bill the City for disposing of every load of excavation material.

> ii.    *Invoices from Enterprise to the City for Disposal of Loads Brought by City Trucks and Michael Shell's Testimony.*

It was not unreasonable for Milner not to present invoices in Exhibit I showing that Enterprise billed the City for disposal when City trucks brought debris to the Enterprise dump site and for bringing backfill to non-baseball stadium sites. Harris does not explain if these services were included within the invoices that constituted the

fraud, Government's Trial Exhibits 26 through 32. His exhibit I appears to consist of mostly invoices included in the Government's Trial Exhibits 26 through 32. So these invoices were presented at trial. Harris has only resubmitted these invoices. He has not explained how they show either that Enterprise billed the City legitimately under other contracts or that Enterprise billed the City for demolition or back-fill work that was not also billed to Rieth-Riley. Harris asserts that some of the hauling and disposal work done for the City of Gary (and again it's not clear if this was work which was included in the allegedly double-billed invoices) was done on days on which no bills were submitted to Rieth-Riley for stadium work. (DE # 200 at 5.) But Harris does not point to any specific invoices or any days. He does not compare the invoices to the Rieth-Riley bills.

If these services and invoices were done pursuant to other contracts or were not part of the allegedly double-billed invoices, they were not related to the stadium excavation double-billing scheme and thus had limited relevancy to the issues at trial. If these services and invoices were included in the proof of double-billing, Harris does not show how they were not double-billed or how they involved demolition work rather than excavation work. He has not pointed to anything in these documents that would refute the government's evidence, including Urbanik's testimony, that Enterprise billed both Rieth-Riley and the City for the same excavation work. Either way, Harris has not shown that these documents could have had any effect on the outcome of his trial.

Similarly it was not unreasonable for Milner not to present the testimony of City of Gary foreman Michael Shell that the City of Gary used Enterprise's dump for the disposal of demolition debris from the stadium site because this work involved demolition, not excavation, and was not billed to Rieth-Riley. Harris has not shown that this demolition disposal work was included in the double-billed invoices.

Further, this evidence would not have made a difference at trial. There was already evidence that the City treated hauling separately from disposal - they were covered under two different contracts and they were paid for at two different rates. There was ample evidence that Enterprise billed both Rieth-Riley and the City for hauling the stadium excavation material. There was also evidence that Rieth-Riley's contract with the city covered disposal and evidence to support an inference that Rieth-Riley's subcontract with Enterprise covered disposal. Further, Harris's argument ignores the fact that the retroactive contract described work related to demolition. Even if the jury saw evidence that disposal could have been charged separately to the City, the contract and documents related to the approval of the contract would have shown that disposal was intended to be related to demolition work, not excavation work.

### iii. Invoices to the City from Aavatar Enterprises and Congress Enterprises for Demolition and Testimony of John Schiralli.

The invoices from Aavatar Enterprises and Congress Enterprises to the City for demolition work had no relevancy to the charges against Harris for double-billing. These invoices were related to demolition, not to the hauling and disposal of excavation

material. Contrary to Harris's arguments, the City's relationship with two other vendors for a different type of work for different projects does not have bearing on the City's knowledge of Enterprise's work with Rieth-Riley or on the City's intention for the retroactive contract with Enterprise. If presented at trial, it seems that these invoices would have only added confusion and tangential information.

Harris also argues that Milner should have presented testimony from John Schiralli that his company, Aavatar Enterprises, was hired to demolish buildings at various places within the baseball footprint and that debris was hauled away by Enterprise. (DE # 200 at 4.) The relevancy of this testimony seems attenuated at best. Proof that Enterprise hauled demolition material within the baseball stadium during that same period does not refute evidence presented by the government that Enterprise billed the City and Rieth-Riley for hauling and disposing of the same excavation loads. Harris has not shown that this work was included in the allegedly double-billed excavation material invoices to the City from Enterprise.

   ***iv.  Invoices from Enterprise to Rieth-Riley for Other Projects.***

Harris has not shown that the 38 pages of invoices for the Black Oak project had any relation to the stadium project. He has not argued that they were included in the Rieth-Riley invoices presented at trial. It is very difficult to see how these invoices would have related to the issues at trial and even more difficult to decipher how they would have exculpated Harris. Their only possible relevancy would have been to show that Enterprise was busy during the summer of 2001 and that it worked with Rieth-

Riley on other projects which could have been a source of confusion. But Arce testified

that Enterprise had several contracts with Rieth-Riley including the one at Black Oak

(Arce, Trial Tr., vol. 2, 199-200), so the documentary evidence would have been both

cumulative and confusing.

> *v.* **Invoices to the City from Fertile Earth, Lake County**
> **Transfer Station, and Gary Transfer Station for Disposal of**
> **Enterprise-hauled Loads.**

It appears that all that these 300-plus pages of documents would have added to

the trial would have been clutter and confusion. Harris states that these documents

show that Enterprise hauled waste for disposal at these other sites at the City's

direction. (DE # 200 at 21.) The invoices show that Enterprise billed the City for hauling

but not disposing of these loads. The only relevant issue that these invoices could be

directed to is that the city treated hauling and disposal separately. As previously

explained, there was evidence at trial that the City considered hauling and disposing to

be two separate billable activities, and these documents were not needed to show that.

> 3.    Jeff Bool's Testimony.

Harris argues that Milner provided ineffective assistance of counsel by failing to

call Enterprise field manager, Jeff Bool ("Bool"), to testify. (DE # 200 at 3.) According to

Harris, the following parts of Bool's grand jury testimony would have weighed against

a finding of Harris's guilt: 1) Enterprise hauled away demolition debris from structures

within the baseball stadium footprint; 2) Enterprise sorted sand from debris and took

the debris to the Enterprise dump and the sand to Rieth-Riley's scale and then to the

Route 41 site; 3) Enterprise's responsibilities under the Rieth-Riley contract were only for hauling, not for disposing; 4) several people did the billing for Enterprise, so double-billing could have happened accidently. (DE # 200 at 3.) But Harris has not shown that the result of the trial would have been different "but for" the absence of Bool's testimony.

First, the testimony about hauling demolition material would not have undermined confidence in Harris's conviction. There was plenty of evidence at trial that Enterprise had contracts with the City to cover demolition so this evidence would have been cumulative. Even if Enterprise was hauling demolition material, it did not have the right to charge the City and Rieth-Riley for the same work. Second, the court has already found that evidence about sorting sand would not have made a difference at trial. This is because 1) evidence on this point was presented at trial and 2) evidence of separately billing sand does not excuse the double-billing of the hauling and disposal of other materials. Third, while Harris states that Bool testified that hauling, but not disposal, was covered under the subcontract, the part of the transcript Harris points to does not support this assertion. Bool stated that hauling should not have been charged to both Rieth-Riley and the City. (Bool, Grand Jury Tr. at 37-38, DE # 200-2.) He did not discuss the contract with Rieth-Riley or say that he had any personal knowledge of it.

Fourth, Bool's testimony about multiple people doing billing at Enterprise and the possibility of confusion would have been cumulative. Bool testified to the grand jury that double billing may have been done by mistake if two separate people worked

on the invoices. (Bool, Grand Jury Tr. 59-60, DE # 200-2.) However, Linda Arce provided the same type of testimony. (Arce, Trial Tr., vol. 2, 200.) She testified that Harris was not involved with billing and that several people, including Bool, Vasquez, Kimberly Andrews, and Arce were involved with billing. (*Id.* at 184-85, 188-89)

Even more, as the government pointed out, there were parts of Bool's grand jury testimony that could have hurt Harris at trial. For example, Bool testified that he was instructed by either Arce or Harris to bill tickets from the mass excavation project at the stadium to the City of Gary's Redevelopment Project. (Bool, Grand Jury Tr. 20, DE # 200-2.) He also testified that he would have thought it was weird to bill both the city and Rieth-Riley for the same work. (*Id.* at 58.) Bool also stated that there had been a conflict between Rieth-Riley and defendant about who would be doing the hauling for the stadium site excavation. (*Id.* at 19.) He stated that the Enterprise trucks blocked the gate so that no one else could haul things away that day. (*Id.*) Bool, who was a dispatcher and truck supervisor and helped with billing, testified that it "doesn't make sense to bill" two companies for the same hauling. (*Id.* at 38.) He also testified that it would not have surprised him to hear that over a million dollars worth of the Rieth-Riley excavation material was also billed to the city. (*Id.* at 46.) Given these negative comments, it was not unreasonable for Milner not to call Bool to testify.

*B.    Presentation of Evidence About Bool and Vasquez.*

Harris argues that Milner was ineffective because of his "inexplicable decision to base a defense on the alleged practices of Kelly Vasquez and Jeff Bool, but not to call them as witnesses." (DE # 213 at 14.)

    1.    Kelly Vasquez.

During opening arguments, Milner stated that Harris had hired Vasquez, a former IRS agent, to improve Enterprise's bookkeeping practices during the same time period as the double-billing. (Trial Tr., vol. 1, 45.) He argued that it would be unlikely for Harris to hire Vasquez to oversee his books while he was perpetrating a double-billing scheme. (*Id.*) Milner did not call Vasquez to the stand. Instead he questioned Arce about the state of Enterprise's bookkeeping prior to Vasquez's employment and what Vasquez's role was. (Arce, Trial Tr., vol. 2, 182.) On cross-examination, the government questioned Arce about Vasquez's role in investigating Harris's tax issue when Vasquez was an IRS agent. (*Id.* at 208.) Arce did not have personal knowledge about this line of questioning and therefore could not offer much testimony on it. (*Id.*)

Milner's mention of Vasquez's intended testimony during his opening arguments was not unreasonable. At the beginning of the trial, this court asked the government if it was going to call Vasquez and the government attorney responded that she would be called. (Trial Tr., Vol. I p. 7, 12.) Therefore, when Milner gave his opening remarks later that day, he was under the impression that the government would be

calling Vasquez even if he did not, and it was reasonable for him to mention what her testimony might be.

Further, Milner was reasonable in not calling Vasquez to the stand. As the government points out, Arce was able to testify to Enterprise's bookkeeping procedures before and after Vasquez was hired. This was helpful to show the confusion with bookkeeping during the summer of the alleged fraud and the ways in which Harris hoped Vasquez could improve the systems. Further, Arce was not susceptible to the same impeachment as Vasquez. She had personal knowledge of Vasquez's role in improving Enterprise's bookkeeping, but she did not have personal knowledge of Harris's hiring of Vasquez or of why Vasquez left the IRS for Enterprise. After Vasquez's departure from the IRS was questioned during Urbanik's direct examination, Milner vigorously cross-examined Urbanik on the limited extent of his personal knowledge of Vasquez' departure from the IRS. (Urbanik, Trial Tr., vol. 2, 251-53.) Milner's strategy of highlighting Vasquez's involvement in Enterprise's bookkeeping during the time of the double-billing scheme was not unreasonable. This was a strategic choice that the court declines to second-guess. *United States v. Williams,* 106 F.3d 1362, 1367 (7th Cir. 1997).

### 2.   Jeff Bool.

Bool had an integral role in Enterprise during the time of the double-billing as he participated in both invoicing and in directing drivers. Harris argues that Milner unreasonably elicited testimony about Bool during his cross-examination of Allen.

(DE # 213 at 15.) However, Allen had already mentioned Bool's important role at Enterprise during his direct examination. (Allen, Trial Tr., vol. 1, 181, 190.) It was not possible for Milner to prevent Bool from being mentioned once the government called Enterprise employees like Allen to the stand. Further, as already discussed, it was not unreasonable for Milner not to call on Bool to testify and the absence of Bool's testimony does not undermine confidence in the jury's verdict. As mentioned earlier, Bool's grand jury testimony included portions that would not have been favorable to Harris. Therefore, Milner's strategy for presenting Bool's role at Enterprise was reasonable.

C.   *Failure to Make Objections at Trial.*

1.   Failure to Object to Urbanik's Testimony as Improper Opinion Testimony.

Harris argues that Urbanik's testimony about Enterprise's contract with the city amounted to an opinion which was improper because contract interpretation is not subject to opinion testimony. (DE # 213 at 16.) He also argues that Urbanik did not testify as to any expertise to qualify him to testify as to how the Rieth-Riley invoices matched the City invoices. (*Id.*)

However, Urbanik was not interpreting the contracts, he was simply relying on his personal knowledge of the contracts pursuant to FEDERAL RULE OF EVIDENCE 601 and relaying the contents of the contracts to the jury. Harris is correct that contract interpretation rests in the province of the jury. *Loeb v. Hammond,* 407 F.2d 779, 781

(7th Cir. 1969) ("The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony."); *see also Cogswell v. CitiFinancial Mortgage Co., Inc.*, 624 F.3d 395, 400 (7th Cir. 2010). But he does not point to any contract ambiguities that Urbanik was interpreting. Urbanik was not giving testimony or opinion as to what the contracts meant or how they should be interpreted. For example, he testified about the price and time terms as reflected in the contracts. (Urbanik, Trial Tr., vol. 2, 46-48.) He also read direct passages from the contracts. Thus he was not offering improper opinion testimony as to contractual interpretation; he was presenting the unambiguous language of the contracts to the jury. Additionally, the contracts themselves were entered into evidence. Once the jury received information about the contracts from Urbanik and from seeing the contracts in evidence, the jury members were free to interpret the contracts for themselves.

Further, no expertise was needed to match the invoices. Harris argues that Urbanik offered an opinion when he stated that the invoices to Rieth-Riley and the City were for "the same" work. (DE # 223 at 21.) Harris argues that this was an opinion that assumed that hauling and disposal were the same work rather than two separate billable activities. (*Id.*) However, Urbanik's testimony was not an opinion that hauling and disposal were the same type of work. Instead, Urbanik was testifying that the invoices involved the same loads and the same timing. (Urbanik, Trial Tr., vol. 2, 35-39.) Also Harris glosses over the fact that Enterprise billed both Rieth-Riley and the City for the hauling so that work was the same. The prosecution also presented the testimony of

Campbell, a driver for Enterprise, that he completed time sheets and weigh tickets for hauling and disposing of the same loads. (Campbell, Trial Tr., vol. 1, 160-65.)

Further during closing arguments, Milner made the argument that hauling and disposal were two separate billable activities. He argued, as Harris continues to now, that Enterprise had a contract with Rieth-Riley just for the hauling and then it had a contract with the City for the disposal. (Trial Tr., vol. 3, 28.) He contended that Enterprise's only mistake was in charging both entities for the hauling. (*Id.* at 28, 32-33.) It was up to the jury, based on their understanding of all of the testimony and documentary evidence, including the contracts, invoices, weigh tickets, and time sheets, to decide whether the invoices and contracts covered the same or different work.

### 2. Failure to Object to Testimony About Harris's Relationship with King.

Harris argues that Milner should have objected to testimony by King about his close relationship with Harris because it was irrelevant and allowed the jury to speculate as to whether Harris was involved in political corruption. (DE # 213 at 17.) However, this testimony was relevant. The government sought to establish that Harris had a close relationship with King and told him about business opportunities and activities. Through this testimony, the government sought to establish that it was an anomaly for Harris not to have disclosed the Rieth-Riley subcontract to King. Further as the government points out, none of King's testimony about Harris's involvement in City politics was improper. (DE # 2220 at 22.) Therefore, Milner did not provide ineffective

assistance of counsel by failing to object to King's testimony about Harris's political involvement.

        3.      <u>Improper Summation</u>.

Harris argues that Milner was ineffective because he failed to object during summation when the government stated that witness Douglas Robinson and Rieth-Riley and no reason to lie and when it argued that it "makes no difference" whether defendant ever told anyone he was double billing. (DE # 213 at 11.) He argues that the prosecutor's statement about Robinson's truthfulness was especially prejudicial in light of Harris's contention that Robinson's testimony was in fact untruthful. (DE # 223 at 19.) The government responds that even if the prosecutor's statements about Robinson's truthfulness were improper, they did not deprive Harris of a fair trial in light of all of the evidence of Harris's guilt and the court's instruction that counsels' arguments were not evidence. (DE # 220 at 24.) It also argues that the prosecutor's comments about defendant's admission of guilt were not improper because they were directed toward the proposition that direct evidence of guilt was not required. (*Id*.) It also argued that even if this statement was improper it was corrected by the court's instructions on direct and circumstantial evidence, it was countered by defense counsel's emphasis on the lack of evidence of knowledge, and it was balanced by the ample evidence establishing Harris's guilt. (*Id*.)

To determine whether the government made improper comments that prejudiced the defendant's right to a fair trial, the court must first decide whether the

challenged statements in isolation were improper and, if they were, the court must then evaluate the remarks in the context of the entire trial to determine if they deprived the defendant of a fair trial. *United States v. Ferguson*, 935 F.2d 1518, 1530 (7th Cir. 1991). When determining whether the defendant was deprived of a fair trial, the court should consider:

> (1) whether the prosecutor misstated the evidence; (2) whether the remark implicated a specific right; (3) whether the defendant invited the response; (4) the efficacy of curative instructions; (5) the defendant's opportunity to rebut; and (6) the weight of the evidence.

*United States v. Serfling*, 504 F.3d 672, 677 (7th Cir. 2007). Another relevant factor is the nature and seriousness of the misconduct. *United States v. Sandoval-Gomez*, 295 F.3d 757, 763 (7th Cir. 2002) (citing *United States v. Scott*, 267 F.3d 729, 740 (7th Cir. 2001)). The most important factor to consider is the weight of the evidence. *Serfling,* 504 F.3d at 677.

During closing arguments, the prosecutor stated that Robinson had "no reason to come in here and tell you anything but the absolute truth" (Trial Tr., vol. 3, 5) and that Robinson and Rieth-Riley had "no motive to lie." (*Id.* at 22.) As Harris points out, it can be improper for a prosecutor to vouch for a witness's credibility and to state that he has no reason to lie. *United States v. Johnson-Dix*, 54 F.3d 1295, 1304-05 (7th Cir. 1995).

Even if this statement may have been improper, it did not deprive Harris of a fair trial. *United States v. Simmons,* 581 F.3d 582, 590 (7th Cir. 2009) (noting that a court can dispose of this issue by only looking at the second prong if it finds that the prosecutorial remarks were not prejudicial). First, the court minimized any possible prejudice to the

defendant through its jury instructions and other verbal instructions to the jury. Court instruction six including the following statement:

> [T]he lawyers' statements to you are not evidence. The purpose of these statements is to discuss the issues and the evidence. If the evidence as you remember it differs from what the lawyers said, your memory is what counts.

(Trial Tr., vol. 3, 66.) Immediately before closing arguments began, this court reminded the jury:

> And again, what these lawyers say in their final arguments is not evidence; and you will disregard what they say unless it is supported by the evidence that you saw and heard during the presentation of evidence phase of this case.

(*Id.* at 2.)

The court also instructed the jury that it had the responsibility to decide the truthfulness of each witness's testimony based on the consideration of many things including the witness's intelligence, the opportunity that the witness had to observe what he talked about, the witness's memory, the manner of the witness while testifying, the reasonableness of the witness's testimony in light of all of the evidence, and any interest, bias or prejudice of the witness. (*Id.* at 65.) Accordingly, the court instructed the jury that the lawyer's final arguments were not evidence and it directed the jury as to what it should consider when weighing a witness's credibility. This helped to minimize the effect of the prosecutor's statements about Robinson's truthfulness.

Second, the weight of all of the evidence of Harris's guilt indicates that the allegedly improper comments about Robinson's truthfulness were not responsible for

the jury's finding of guilt, and therefore relief is not proper on this basis. *Johnson-Dix,* 54 F.3d at 1305. The jury was presented with the disputed invoices and testimony about the overlap in these invoices, the relevant contracts, testimony about the city's understanding of its retroactive contract with Enterprise, and testimony that Harris directed the loads of excavation material to be weighed.

Harris's argument that he was subjected to prosecutorial misconduct when the prosecutor stated that the judge would instruct the jury that the lack of an admission of Harris about double-billing "makes no difference" (Trial Tr., vol. 3, 7) is also unavailing. This comment does not appear to be an improper pronouncement of the government's burden. Rather it makes reference to the fact that Harris could be found to have acted knowingly without direct evidence. In the case of proving intent to defraud "direct evidence of a defendant's fraudulent intent is typically not available." As the Seventh Circuit has stated, "direct evidence of intent to defraud is rare." *United States v. Sloan,* 492 F.3d 884, 891 (7th Cir. 2007). Therefore, "specific intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *United States v. LeDonne,* 21 F.3d 1418, 1426 (7th Cir. 1994).

Even if this statement was improper, it was outweighed by the evidence of Harris's guilt as summarized above. It was also ameliorated by the court's instructions about direct and circumstantial evidence. In the statement at issue, the prosecutor

purported to tell the jury about how the judge would instruct them about a finding of knowledge. However, the jury soon had an opportunity to hear the court's instruction as to knowledge. The court instructed the jury that direct evidence was not needed for a finding of guilt. (Trial Tr., vol. 3, 66.) The court stressed that it was the government's burden to prove beyond a reasonable doubt that Harris acted knowingly with intent to defraud. (*Id.* at 71-73.) The court instructed: "Knowledge may be proved by a defendant's conduct or by all the facts and circumstances surrounding the case." (*Id.* at 73.) Further, defense counsel argued extensively during closing arguments that Harris did not act knowingly and that the government did not have direct proof of knowledge. (*Id.* at 27-28, 50-51, 53.) Accordingly, the prosecutor's remarks about the value of a lack of an admission by Harris did not prejudice him at trial. In sum, none of the identified errors at trial support an ineffective assistance of counsel claim under *Strickland*.

> D.    *Other Trial Errors.*

> > 1.    Failure to Cross-examine Tousant.

Harris argues that Milner erred by not cross-examining Tousant about her knowledge of Enterprise's work with Rieth-Riley. (DE # 220 at 19.) The court has already discussed at length that evidence of Tousant's knowledge of this subcontract would not have affected the result of the trial. Tousant's knowledge would not have

shown that Harris did not try to keep the subcontract from the City or that Harris did not submit bills for the same work to Gary and Rieth-Riley.

### 2. Opening the Door to Bad Acts Testimony.

Milner asked Arce for her opinion of Harris's truthfulness. Once he did this, he opened the door and the government was able to ask Arce about political contributions that Harris asked her to make and reimbursed her for. However this open door did not prejudice Harris. There was substantial evidence against Harris - testimony that he directed Enterprise trucks, testimony that the Rieth-Riley time sheets matched the activity and times of the weigh tickets for the City, the retroactive contract with the City covering demolition work, the contract between Rieth-Riley and the City. With all of this evidence presented against Harris, the testimony about the political contributions did not prejudice him.

### 3. Failure to Prepare for Trial, Conduct Proper Legal Research and Investigate.

Harris make a general claim that Milner provided ineffective assistance of counsel because he did not adequately prepare for trial, did not conduct proper legal research, and did not properly investigate. He asserts that his motion should be construed to encompass all errors resulting from these failures. (DE # 200 at 8.) To meet the first part of the *Strickland* test, a "defendant must identify specific acts or omissions that fell outside the wide range of professionally competent assistance." *United States v. Herrera-Rivera*, 25 F.3d 491, 496 (7th Cir. 1994). As the Seventh Circuit has stated "[a]n

ineffective assistance of counsel claim cannot rest upon counsel's alleged failure to engage in a scavenger hunt for potentially exculpatory information with no detailed instruction on what this information may be or where it might be found." *United States v. Farr*, 297 F.3d 651, 658 (7th Cir. 2002). Harris has not pointed to anything specific under this ground, so it fails as an individual basis for relief. He has also not claimed that Milner failed to investigate at all. In fact, the record shows that Milner conducted vigorous cross-examination of the government's witnesses showing that Milner had a good grasp of the issues involved in the trial.

      *E.     Sentencing.*

      Harris argues that Milner provided ineffective assistance of counsel when he failed to object to the court's statement at sentencing that it would "only sentence below the guidelines in unusual cases for clearly identified and persuasive reasons." (DE # 213 at 13.) In his estimation, this statement amounted to a presumption that the United States Sentencing Guidelines are reasonable in most cases. (*Id.*) The government responds that the transcript from the sentencing hearing, when read as a whole, shows that the court did not presume that the Guidelines were reasonable and that court's statement indicated only that the Guidelines "seek to embody the § 3553(a) factors" and should not be cast aside lightly. (DE # 220 at 26 (quoting *United States v. Rita*, 551 U.S. 338, 350 (2007)).)

      Indeed, district courts may not presume that a sentence within the Guidelines range is reasonable. *Nelson v. United States*, 129 S.Ct. 890, 891 (2009); *Gall v. United States*,

552 U.S. 38, 49-50 (2008); *United States v. Rita*, 551 U.S. 338, 350 (2007). Harris points to

*Nelson* for the proposition that a court violated this principle when it stated that "'unless

there's a good reason in the [statutory sentencing] factors ..., the Guideline sentence is

the reasonable sentence.'" *Id*. However, this is misleading. The full statement that the

Supreme Court considered was: "the Guidelines are considered presumptively

reasonable,' " so that " 'unless there's a good reason in the [statutory sentencing]

factors . . ., the Guideline sentence is the reasonable sentence.'" *Id*. The Supreme Court

found that these comments taken as whole showed that the trial court gave a

presumption of reasonableness to the Guidelines sentence.

In this case, not only did the district court not make any statement that the

Guidelines were reasonable, it carefully explained that the Guidelines were only one of

the things to be considered under 18 U.S.C. § 3553(a) in determining a reasonable

sentence for Harris. The court explained that *Booker* made the Guidelines advisory,

"requiring sentencing a court like this one to consider these guideline ranges but only in

light of all of the relevant sentencing factors in order to arrive at a reasonable and just

sentence." (Sentencing Tr. Vol. 1 p.38, DE # 166.) The court then stated that it would

determine a reasonable sentence in light of all of the 18 U.S.C. § 3553 factors. (*Id*.) A few

minutes later, the court again stated that the "wisdom that has been expressed in the

advisory sentencing guidelines is just one of the factors which influences this court in

the exercise of [its] discretion in determining what sentence to impose here." (*Id*.) The

court then listed several of the Section 3553(a) factors and explained that the Guidelines

34

were crafted to help achieve the goals expressed in these factors, echoing the Supreme Court's assessment of the Guidelines in *Gall* and *Rita*. (*Id.* at 38-39.) *Gall*, 552 U.S. at 46 ("For even though the Guidelines are advisory rather than mandatory, they are, as we pointed out in *Rita*, the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions.").

Only after all of this discussion did the court state that it will "only sentence below the guidelines in unusual cases for clearly identified and persuasive reasons." (*Id.* at 39.) The court then concluded that in consideration of all of the previously stated Section 3553(a) factors, the advisory guidelines maximum sentence was "reasonable and appropriate here." Therefore the court did not state that the Guidelines range was presumptively reasonable, but only that a sentence within that range was reasonable and appropriate in Harris's case when all of the Section 3553(a) factors were considered. The court was careful to regulate the Guidelines to their proper advisory role among the many Section 3553 factors and did not endow them with an impermissible presumption of reasonableness. Therefore, it was not error for Milner to fail to object to the court's statement as violating *Rita, Nelson* and *Gall*. Relief under Section 2552 cannot rest on this basis.

## II.      Conflict of Interest.

Harris argues that he was deprived of effective assistance of counsel because 1) Milner had an actual conflict of interest due to his former representation of government witness Husein Mahmoud ("Mahmoud") and 2) Harris did not sufficiently

waive this conflict of interest. (DE # 200 at 8; DE # 213 at 15.) He argues that an actual

conflict existed if Milner's representation of Mahmoud related to the baseball stadium

or if it may have restricted Milner from fully cross-examining Mahmoud.

(DE # 213 at 22.) Harris contends that he was not able to waive the conflict because he

was not aware of the subject matter of Milner's representation of Mahmoud or of the

particular areas of cross-examination that might be restricted. (*Id*.) He argues that the

court should have given him the opportunity to consult with independent counsel

before it asked for his waiver. (*Id*. at 22-23.)

At the beginning of Harris's trial, the court informed him that Mahmoud was a

former client of Milner's. (Trial Tr., vol. 1, 2.) Milner explained that a number of years

ago Mahmoud had come to him for advice related to his investigation by the

government. (*Id*.) Milner's involvement ended when the government decided that it

would not prosecute Mahmoud in exchange for his assistance. (*Id*.) The court informed

Harris that he had a constitutional right to effective assistance of counsel including a

right to a lawyer with no conflict of interest. (*Id*. at 3-4.) The court told Harris that

Milner may have problems with cross-examining Mahmoud with complete fairness and

with investigating Mahmoud because he could not share information with Harris or ask

Mahmoud questions about issues that might be covered by the attorney-client privilege.

(*Id*.) Harris stated that he understood all of that. (*Id.* at 4.) Milner then verified that there

would be no conflict that would result in ineffective assistance of counsel or otherwise

prejudice Harris. (*Id.* at 4-5.) Finally, the court asked Harris if he wanted to waive his

right to conflict-free counsel related to Milner's former representation of a possible government witness in the case. (*Id.* at 5.) Harris said that he did and that he understood what he was doing by waiving that right. (*Id.*)

A conflict of interest exists when counsel's former representation of a witness substantially and particularly related to counsel's representation of the defendant or the counsel learned specific confidential information during that representation that was relevant to defendant's case. *Enoch v. Gramley*, 70 F.3d 1490, 1496-97 (7th Cir. 1995). In order to establish that an actual conflict existed that adversely affected counsel's performance, Harris must point to "specific instances in the record." *United States v. Roth*, 860 F.2d 1382, 1389 (7th Cir. 1988). "The possibility of divided loyalties is insufficient proof of actual conflict," instead the defendant must point to specific instances where his attorney could have, and would have, done something different." *Id.* (internal quotations omitted). Here, Harris has not presented any specific allegations or evidence to show that Milner had an actual conflict of interest.[2] He only asserts that an actual conflict of interest would exist if Milner's representation of Mahmoud "was related in any substantial way to the baseball stadium" or to the City budgets and finances for the stadium. (DE # 213 at 22; DE # 223 at 27.) More importantly, Harris does not point to any specific instances in which Milner's representation could have

---

[2] Harris asks for a hearing on this point. (DE # 223 at 29.) However, he is not entitled to a hearing because he has not made any allegations that, if true, would show that there was an actual conflict of interest. *Lafuente v. United States*, 617 F.3d 944, 946 (7th Cir. 2010).

been different if he had not previously represented Mahmoud. However, even if there was a conflict of interest, Harris's waiver of that conflict was valid.

For a waiver to be valid, it is sufficient that the defendant is informed of "the character of the risks at stake and [can] proceed with his eyes open." *United States v. Colonia,* 870 F.2d 1319, 1327 (7th Cir. 1989). To this end, the judge must "inform a defendant of the character and importance of his right to conflict-free counsel, and guarantee that the defendant comprehends the consequences of a conflict and his entitlement to conflict-free counsel." *Id.* As described above, the court repeatedly emphasized to Harris his right to conflict-free counsel and the importance of that right. The court informed Harris of how Milner's former representation of Mahmoud could affect his representation of Harris - that it could limit his cross-examination of Mahmoud and would limit the information Milner could share with Harris and the jury about Mahmoud. This was sufficient to inform Harris of the risk presented by the conflict and Harris then made a knowing, informed waiver. Harris argues that he should have been apprised of the subject matter of Milner's representation of Mahmoud, whether Milner knew of any wrongdoing by Mahmoud, and why Mahmoud was not prosecuted.[3] (DE # 223 at 28.) But a waiver is not invalid simply because a defendant did not have perfect information, or even potentially important

---

[3] In regard to this issue, the record shows that the government decided not to prosecute Mahmoud in exchange for his assistance. (Trial Tr., vol. 1, 2.)

information. *Roth*, 860 F.2d at 1387-88. The waiver is binding because Harris made it while informed of the risks it entailed. *Id.* at 1387-89.

Harris's waiver was not invalid due the fact that he was not given the opportunity to consult with independent counsel. Harris argues that while the Seventh Circuit does not impose such a requirement, the United States Court of Appeals for the Second Circuit and other jurisdictions favor this procedure. (DE # 213 at 23.) He points to *United States v. Fulton*, 5 F.3d 605, 613 (2d Cir. 1993), in support of this contention. However, in *Fulton*, the Second Circuit explained in dicta that when a conflict prevents counsel from asking certain questions on cross-examination or from raising a certain defense, the defendant can be apprised of the alteration in the defense caused by the conflict and then can consult with independent counsel. *Id.* It did not mention any requirement of an opportunity to consult with independent counsel. Here, Harris was able to appreciate the import of his waiver of the conflict of interest without the assistance of independent counsel.

## III. Ineffective Assistance of Appellate Counsel.

The *Strickland* test also applies to questions of ineffective appellate counsel. Harris must show that 1) his appellate counsel was incompetent so as to fall below the standard of reasonableness and 2) that Harris suffered prejudice as a result of this ineffective performance. *Barrow*, 398 F.3d at 603. In this situation, to show prejudice, Harris must show a reasonable probability that, but for ineffective assistance of counsel, he would have prevailed on his appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). In

regard to the first prong of *Strickland,* Harris argues that because his appellate counsel filed an appeal that focused only on his sentence and did not address his conviction, and to show incompetence, he need only show that there was one non-frivolous argument that could be raised on appeal. (DE # 213 at 21.) This is the standard that applies when appellate counsel did not file an appellate brief at all. *Smith*, 528 U.S. at 287. When appellate counsel does file a brief, the presumption that he or she rendered effective assistance is outweighed only when he or she fails to raise "significant and obvious" issues that are stronger than those which were presented. *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1985). Appellate counsel does not need to raise all possible claims of error. *Page v. United States*, 884 F.2d 300, 302 (7th Cir. 1989). Indeed, the Seventh Circuit has noted that "[o]ne of the principal functions of appellate counsel is winnowing the potential claims so that the court may focus on those with the best prospects." *Id*.

Harris's argument that his situation is equivalent to one in which no appellate brief is filed is thought-provoking but ultimately not convincing. The Supreme Court has explained that appellate counsel who files a "merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith*, 528 U.S. at 288. That principal still applies when appellate counsel chooses only to raise issues of sentencing. Appellate counsel might feel that the best chance a defendant has is to have the sentence reduced and that chance is enhanced by focusing only on sentencing. This is not a situation in

which no brief was filed. Harris's appellate counsel filed a brief with twenty-seven pages of argument on two sentencing issues: that an incorrect base offense level was used and that the loss calculation was incorrect. In fact, one of the sentencing arguments was successful on appeal.[4] Therefore, it seems most appropriate for the court to examine whether the arguments that Harris's appellate counsel raised were less strong than other significant and obvious issues.

Harris argues that four points would have been stronger than the sentencing issues. These four arguments are: 1) a plain-error challenge to the de facto presumption of reasonableness that the court imposed during sentencing; 2) a plain-error challenge to Urbanik's improper opinion testimony; 3) a plain-error challenge to the government's improper summation; and 4) a challenge to the admissibility of Harris's lobbying contracts with the City of Gary and testimony concerning Harris's political power within the City. (DE # 200 at 10.) As discussed above, the court found that none of these alleged errors prejudiced Harris so as to establish a *Strickland* claim. Therefore, all of the arguments pointed to by Harris were losing arguments that appellate counsel did not need to present. *Whitehead v. Cowan*, 263 F.3d 708, 731 (7th Cir. 2001). None of these arguments appear to be significantly and obviously stronger than the sentencing issues and the failure to raise these issues on direct appeal did not prejudice Harris.

_____

[4] However, Harris's sentence was not reduced as a result of the appeal. The Seventh Circuit agreed that Harris's base offense level was a point too high, but found that the court had also failed to apply an applicable one point enhancement, so his total offense level would have remained the same. *United States v. Harris*, No. 08-3010 (7th Cir. June 18, 2009).

**IV.    Other Grounds For Relief**.

Harris asserts several grounds for relief that he did not raise on direct appeal. He also raises each of these as part of his ineffective assistance of counsel claim which has already been addressed. These grounds are: 1) admission of Harris's lobbying contract and involvement in City of Gary politics; 2) Urbanik's allegedly improper opinion testimony; 3) the government's improper summation; and 4) the court's purported presumption that the guidelines were reasonable at sentencing. (DE # 200 at 14-16.)

> An issue not raised on direct appeal is barred from collateral review absent a showing of both good *cause* for the failure to raise the claims on direct appeal and actual *prejudice* from the failure to raise those claims, or if a refusal to consider the issue would lead to a fundamental miscarriage of justice.

*Prewitt*, 83 F.3d at 816 (emphasis in original). Additionally, a showing that a refusal to consider the issue would be a "fundamental miscarriage of justice" can overcome the default. *Id; Galbraith v. United States*, 313 F.3d 1001, 1006 (7th Cir. 2002).

Harris argues that he had good cause for failing to bring these claims on direct appeal because of ineffective assistance of his trial and appellate counsel. As previously discussed, Harris's counsel was not ineffective in not making objections on these grounds at trial and his appellate counsel was not ineffective in not raising these grounds in the direct appeal. Further, as previously discussed, none of these grounds prejudiced Harris at trial.

## V.     Presentation of False Testimony.

The government argues that Harris's claim for relief on the basis of the presentation of false testimony was procedurally defaulted because he did not raise it on appeal. Harris contends that he did not need to raise this argument on appeal because it is based on evidence extrinsic to the trial and therefore could not have been raised on appeal. (DE # 223 at 30.) Even if the court assumes that Harris's claims are not procedurally defaulted, he cannot succeed on the merits. Harris argues that his due process rights were violated at trial because the government presented false testimony against him. Harris can be granted a new trial on this basis if he can establish that 1) the government presented false testimony; 2) the government knew or should have known that the testimony was false; and 3) there is a reasonable likelihood that the testimony could have affected the jury's judgment. *Griffin v. Pierce,* 622 F.3d 831, 842 (7th Cir. 2010).[5] Harris contends that the government presented false evidence in at least three instances: 1) Tousant's testimony that she was unaware that Enterprise had a subcontract with Rieth-Riley for the excavation work; 2) Robinson's testimony that Rieth-Riley never instructed Enterprise to weigh loads of excavation material; and

---

[5] Harris cites to a Second Circuit case, *United States v. Wallach*, 935 F.2d 445, 456 (2d Cir. 1991), for the idea that the government's use of false testimony has been held to require "virtually automatic" reversal. (DE # 213 at 24.) However, the Seventh Circuit has rejected this standard holding that "[t]he knowing use of perjured testimony is not an automatic ground for a new trial. There must be some likelihood that it made a difference."*United States v. Boyd*, 55 F.3d 239, 243 (7th Cir. 1995); *Griffin,* 622 F.3d at 842.

3) Urbanik's testimony that the disputed Enterprise invoices to the City of Gary were for the same work as that billed to Rieth-Riley. (DE # 213 at 24.) Harris also argues that this list is not exhaustive, but he does not point to any other instances of false testimony. As explained below, Harris has not shown that he should be granted relief on the ground that the government presented false testimony.

A.      *Robinson's Testimony.*

Rieth-Riley's Vice President, Robinson, testified at trial that he would not have instructed Enterprise or Harris to weigh the excavation loads for Rieth-Riley for any purpose. (Robinson, Trial Tr., vol. 1, 73.) He testified that Harris did not submit weigh tickets to Rieth-Riley along with the time sheets for the excavation project. (*Id.* at 72-73.) He also stated that there would not have been a reason for the Enterprise loads related to the excavation contract to be weighed on City of Gary scales. (*Id.* at 73.)

Harris argues that this testimony was false because Enterprise weighed at least 557 of the loads of sand on Rieth-Riley's scales pursuant to Rieth-Riley's request. (DE # 213 at 24.) He argues that at trial the government said that all loads were weighed on the City's scale and that evidence that showed that Rieth-Riley weighed the sand for the Route 41 project would show that it did separate sand, it did not weigh all loads on the City's scale, and it did not bill all of the Rieth-Riley loads to the City. (DE # 223 at 31.)

There is not a reasonable likelihood that this testimony affected the result at trial. First, testimony that some loads of sand were weighed on Rieth-Riley's scales does not

affect a finding that other loads were weighed on the City's scale and billed to the city. Also, the fact that some loads were weighed on Rieth-Riley's scales does not conclusively show that they were not also weighed on City's scales. This is especially possible given that some of the City weigh tickets were missing and, as mentioned earlier, that some of the Rieth-Riley time tickets that Harris say represents sand billed only to Rieth-Riley were part of the government's trial exhibits showing that loads were double-billed. Second, admitted testimony showed that sand may have been weighed on Rieth-Riley's scales. Robinson presented testimony about the use of sand for the Route 41 project. He stated that the sand was being sold to Superior Construction for the Route 41 site and that Superior Construction was paying either by the load or for trucking to their site by the hour. (Robinson, Trial Tr., vol. 1, 62.) Similarly, Allen testified that the sand loads were weighed on Rieth-Riley's scales. (Allen, Trial Tr., vol. 1, 125.) Third, as the government argues, evidence that Rieth-Riley's scales were used for the sand could have supported a finding that Enterprise should never have been using the City of Gary scales for the excavation materials. So there is a possibility that this evidence would have further supported a jury's finding of Harris's guilt. Therefore this allegedly false testimony would not have affected the jury's judgment.

B.      *Tousant's Testimony.*

Tousant testified that she did not know that Enterprise had a subcontract with Rieth-Riley for hauling for the stadium work until the FBI investigation began. (Tousant, Trial Tr., vol. 2, 99.) Harris, pointing to the letter to Tousant from Clay, argues

45

that Tousant did know that Enterprise had a subcontract with Rieth-Riley related to the stadium. (DE # 213 at 25.) As previously described, the letter stated that a Rieth-Riley project manager, Mark Turner, told Clay that Enterprise was working for Rieth-Riley almost every day from June 28, 2001 to July 19, 2001. (Def.'s Exh. G, DE # 200-8.) He stated that Enterprise "removed topsoil and other material for Rieth-Riley." (*Id.*) Clay stated that Enterprise was observed hauling debris for the City of Gary. (*Id.*) The government counters that Tousant's testimony was irrelevant to the issue of whether Harris was receiving payments from Rieth-Riley and the City for the same work. (DE # 220 at 33.) In reply, Harris argues that Clay's letter shows that Tousant knew that Rieth-Riley was paying Enterprise to haul debris. Therefore, the City made a knowing decision to pay Enterprise to dispose of that same debris. (DE # 223 at 31.) Extrapolating even further, Harris argues that the City's decision to pay Enterprise for disposing of the debris shows that the distinction between excavation and demolition debris was immaterial. (*Id.*)

Harris has not established that Tousant's testimony was false or that correcting Tousant's testimony would have been likely to affect the jury's decision. First, while Clay's letter shows that Tousant was told that Enterprise was doing work for Rieth-Riley for the stadium work, it does not show that Tousant was told that Enterprise was hauling debris for Rieth-Riley. In fact, it says that Enterprise was hauling debris for the City. It does not show that the City had knowledge of the nature of Enterprise's contract with Rieth-Riley or of its full extent. And it does not show that the City understood how

that contract related to the $1.6 million of invoices that Enterprise submitted to it. Therefore, Tousant's testimony was not clearly false. Second, correcting Tousant's testimony with this letter would not have affected the jury's decision. Showing that Tousant knew that Enterprise was subcontracting with Rieth-Riley would not render the distinction between demolition and excavation irrelevant. This is especially true in light of the fact that Enterprise's retroactive contract with the City contemplated demolition-related work. Further, the letter from Clay has no bearing on whether Harris tried to hide the subcontract from the City.

     *C.*     *Urbanik's Testimony.*

Harris argues that several parts of Urbanik's testimony were false. (DE # 200 at 12.) He argues that Urbanik testified that he matched Enterprise time sheets to the allegedly fraudulent invoices submitted to the city and that all of those invoices were related to the stadium and had nothing to do with demolition. Harris argues that these invoices included 77 loads hauled by City of Gary trucks and 200 loads of backfill to non-baseball stadium sites. (*Id.*) He also argues that Urbanik testified falsely when he said that the invoices billed to Rieth-Riley were for the same work as that billed by Enterprise to the City. (*Id.*) Harris points out that Enterprise sent invoices to Rieth-Riley for non-stadium projects such as the Black Oak site. (*Id.*) Harris contends that the government relied on Urbanik's testimony that there was a complete overlap in the bills submitted to Rieth-Riley and the bills submitted to the City. (DE # 213 at 20.) Harris contends that proof that Enterprise billed Rieth-Riley and the City for different

projects both shows that Urbanik's testimony was false and makes "accidental double-billing much more likely." (DE # 213 at 20.)

The court agrees with the government that Harris has not shown that Urbanik's testimony was false. Harris has not given any basis for his assertion that the invoices to the City included loads hauled by City trucks or loads of backfill hauled to the stadium. He has made this assertion without pointing to any evidence. His Exhibit I appears to consist of mostly invoices included in the Government's Trial Exhibits 26 through 32. However, Harris has only resubmitted these invoices. He has not shown how they included 77 loads hauled by City trucks or loads of backfill. Shell's and Schiralli's tetimony also would not have shown that the demolition work they mentioned was included in the allegedly fraudulent invoices to the City.

Harris has not shown that work correctly and separately billed to Rieth-Riley and the City was included in the government's evidence of double-billing. He has not shown that the Rieth-Riley invoices relied upon by the government included work for the Black Oak project. Further, proof that some of the excavation hauling involving sand was not weighed on the City's scale and was only billed to Rieth-Riley does not show that other bills that were submitted to both entities were submitted accidently. Finally, Harris points to one Rieth-Riley invoice, number 13493, that did not have a corresponding City of Gary weigh ticket. However, as Urbanik testified, some of the City of Gary weigh tickets were missing. Accordingly, Harris has not shown that any of Urbanik's testimony was false.

## VI.    Request for Hearing on Alleged *Brady/Giglio* Claim.

In order to establish a *Brady* violation, "a defendant must demonstrate that (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense, and (3) the evidence was material to an issue at trial." *Boss v. Pierce,* 263 F.3d 734, 740 (7th Cir. 2001). Evidence was suppressed if "(1) the prosecution failed to disclose evidence in time for the defendant to make use of it, and (2) the evidence was not otherwise available to the defendant through the exercise of due diligence." *United States v. Todd*, 424 F.3d 525, 534 (7th Cir. 2005).

The court notes that it is likely that this claim is procedurally defaulted. Harris has not shown that he had cause for not raising this claim on his appeal or that the failure to raise this claim caused him prejudice or resulted in a complete miscarriage of justice. However, even if the court addresses this claim, Harris has not established a likelihood that a *Brady* violation occurred. Harris argues that he is entitled to a *Brady* hearing because he speculates that the government had cooperation agreements with King and Mahmoud and that they testified against Harris pursuant to these undisclosed agreements. (DE # 200 at 17.) Harris bases this speculation on three things: 1) the statement during the conflict of interest colloquy that Mahmoud had been investigated by the government; 2) the FBI interview notes of James Meyer showing that he was questioned about King; and 3) King's "abrupt resignation for 'family and financial reasons.'" (DE # 213 at 29.)

A court may deny a Section 2255 motion without an evidentiary hearing if "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). The United States Court of Appeals for the Seventh Circuit has ruled that in order for a hearing to be granted "the petition must be accompanied by a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions." *Prewitt v. United States*, 83 F.3d 812, 819 (7th Cir. 1996) (quoting *Barry v. United States,* 528 F.2d 1094, 1101 (7th Cir. 1976)). Unsupported allegations are an insufficient basis for holding a hearing. *Id.* (quoting *Aleman v. United States,* 878 F.2d 1009, 1012 (7th Cir.1989)).

Further, as the government points out, a *Brady* violation cannot be established by "mere speculation" or "unsupported assertion[s] that the government suppressed evidence." *United States v. Jumah*, 599 F.3d 799, 809 (7th Cir. 2010) *(*quoting *United States v. Driver,* 798 F.2d 248, 251 (7th Cir.1986)). Harris only speculates that some kind of agreement existed, so he cannot establish a *Brady* violation. *Todd v. Schomig,* 283 F.3d 842 (7th Cir 2002) (defendant could not establish that a *Brady* violation occurred when he could not prove that an agreement existed between the government and a witness). Further, a hearing is not required because a possible agreement does not undermine confidence in Harris's conviction. Mahmoud and King's testimony was largely cumulative of the contracts in evidence and Tousant's testimony. Their impeachment would not have shown that a different outcome was likely or that the impeachment was material. There is also no proof that the government oppressed an agreement. Therefore, Harris has not shown that he is entitled to a *Brady* hearing.

## VII.    Cumulative Effect of All Errors.

Harris's last argument is that he was prejudiced by the cumulative effect of all of the errors at his trial and on direct appeal. (DE # 200 at 18.) First, as the court has already noted, Harris's ineffective assistance of counsel claim is one ground of relief, and the court assessed the overall effect of the allegedly deficient performance. Therefore, in rejecting Harris's claim for ineffective assistance of trial counsel and appellate counsel, the court has already determined that he was not prejudiced by all of these errors combined. Second, all of the combined grounds for relief do not show that the trial was fundamentally unfair. There was substantial evidence from which the jury could find that Harris was guilty beyond a reasonable doubt. The government presented Enterprise's contracts with Rieth-Riley and with the City, Rieth-Riley's contract with the City, invoices to Rieth-Riley and the City, testimony from Allen that Harris directed Enterprise drivers to weigh loads billed to Rieth-Riley even though Enterprise billed Rieth-Riley on an hourly basis, testimony from Urbanik that the invoices from Enterprise to Rieth-Riley and the City covered the same loads of excavation material delivered at the same time, and testimony that Harris did not tell Mahmoud or King that he had a contract with Rieth-Riley for the excavation work. From Robinson's testimony about Rieth-Riley's contracts with the City and with Enterprise, the jury could conclude that Enterprise's contract with Rieth-Riley covered disposal. Further, Enterprise's retroactive contract with the City and the accompanying meeting notes for that contract supported a finding that it did not cover the hauling

and/or disposal of excavation material. None of the alleged errors in the proceeding would have disturbed the weight of this testimony so as to undermine confidence in his conviction. Therefore, because the"the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief," the court can deny Harris's Section 2255 motion without an evidentiary hearing. 28 U.S.C. § 2255(b).

## CONCLUSION

For the foregoing reasons, the court **DENIES** Harris's Section 2255 motion. (DE # 200.) Pursuant to RULE 11 of THE RULES GOVERNING 2255 PROCEEDINGS, a district court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A court should issue a certificate of appealability ("COA") only if the movant has made a substantial showing of the denial of a constitutional right, that is, that reasonable jurists would find whether the district court correctly resolved the issues debatable or would conclude that those issues are adequate to deserve further proceedings. 28 U.S.C. § 2255 ¶4; 28 U.S.C. § 2253(c)(2); *Miller-El v. Cockrell* , 537 U.S. 322, 337-38 (2003). The court has thoroughly discussed why it finds each ground for relief advanced by Harris to be wholly without merit. The court believes that no reasonable jurist could doubt that this court resolved the issues correctly, or conclude that any of them deserve further proceedings. Accordingly, the court **DENIES** the issuance of a COA.

**SO ORDERED.**

Date: September 22, 2011

s/James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT